IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF | ) |
| THE SEARCH OF | )   **UNDER SEAL** |
| THE BUSINESS PREMISES KNOWN AS | )   Case No. |
| OCEANPRO INDUSTRIES, LTD., | ) |
| also known as PROFISH, LTD. | ) |
| 1900 Fenwick St., N.E. | ) |
| Washington, D.C. | ) |

I, **Allen C. Hundley, Special Agent for the United States Fish and Wildlife Service,** after being duly sworn, declares as follows:

## I.      Introduction

1.      Affiant is a Special Agent (SA) for the United States Fish and Wildlife Service (USFWS) and has been so employed for twenty-four years.  Affiant is a graduate of Virginia Polytechnic Institute and State University where he majored in Forestry and Wildlife Management.  Affiant is a graduate of the Federal Law Enforcement Training Center.  Based upon training and experience, affiant is familiar with the Lacey Act (Title 16, United States Code, Section 3371, *et seq.*) and has investigated violations of the Lacey Act as part of his duties as a Special Agent.

2.      I make this affidavit in support of an application for a warrant to search the premises of the business known as **OceanPro Industries, Ltd.**, also known as **Profish Ltd.**, located at 1900 Fenwick St., N.E., Washington, D.C., which is further described in Attachment A to this affidavit.

3.      I am investigating the activities of **Jerry Lawrence Decatur Jr.**, who makes a living as a commercial fisherman and also operates a commercial guide service

2

for waterfowl hunting, and **Jerry Lawrence Decatur**, who works as a commercial fisherman with his son, Jerry Jr.  The **Decaturs** are both residents of Stafford County, Virginia and conduct their fish business in the Widewater area of Stafford County along the banks of the Potomac River**.**

4.        **OceanPro Industries, Ltd., also known as Profish, Ltd.,** ("**OceanPro/Profish**") is a seafood wholesale business located in Washington, D.C. According to records reviewed, **OceanPro Industries, Ltd.** trades as and is a registered trademark name of **Profish, Ltd.**  These companies share the same physical address of 1900 Fenwick St., N.E., Washington, D.C.; the same registered telephone number of 202-529-3003; the same company president, Greg Casten; and the same registered agent, Nicholas Cibel.  According to the company's website, the company started in 1988 and now employs over 60 employees.  Ben Clough is the Manager for **OceanPro/Profish**.

5.        As will be shown below, there is probable cause to believe that **Jerry Lawrence Decatur, Jr.** and **Jerry Lawrence Decatur** unlawfully have transported, received or acquired in interstate or foreign commerce, wild coastal striped bass, or rockfish, that were taken, possessed, transported or sold in violation of the law of the Commonwealth of Virginia and the regulations of the Potomac River Fisheries Commission, in violation of Title 16, United States Code, Sections 3372(a)(2)(A) and (d)(2).  There further is probable cause to believe that  **Jerry Lawrence Decatur, Jr.** and **Jerry Lawrence Decatur** unlawfully transported, in interstate commerce, illegally taken or possessed wild coastal striped bass, or rockfish, for sale to **OceanPro/Profish** and that evidence of these sales will be found at the business premises of **OceanPro/Profish**.  I am submitting this affidavit in support of a search warrant authorizing a search of the

3

business premises of **OceanPro/Profish**, located at 1900 Fenwick St., N.E., Washington, D.C., more particularly described in Attachment A, for all records reflecting the purchase of wild coastal striped bass, or rockfish, from the **Decaturs**, more particularly described in Attachment B, which items constitute instrumentalities, fruits, and evidence of the foregoing violations.

6.      The statements in this Affidavit are based on my investigation of this matter and on information provided by other law enforcement officers, including officers and agents with the USFWS, Virginia Marine Police, Maryland Natural Resources Police, and King George County, Virginia Sheriff's Office, as well as on my experience and background as a Special Agent of the USFWS.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violation of 16 U.S.C. §§ 3372(a)(2)(A) and (d)(2), presently are located at **OceanPro/Profish,** 1900 Fenwick St., N.E., Washington, D.C.

**II.      Statutory Authority**

7.      **The Lacey Act, Title 16, United States Code, §3372(a)(2)(A),** makes it unlawful for any person to, among other things, import, export, transport, receive or acquire in interstate or foreign commerce, any fish or wildlife that was taken, possessed, transported or sold in violation of any law, or regulation of any state.

8**.      The Lacey Act, Title 16, United States Code, §3372(d)(2),** makes it unlawful for any person to make or submit any false record, account, or label for, or any

4

false identification of any fish, wildlife, or plant, which has been, or is intended to be —

transported, in interstate commerce.

### III.    Background of Potomac River Striped Bass

9.    Wild coastal striped bass (Morone saxatilis), known regionally as the

rockfish, are anadromous.  In early spring, they enter the estuary or river where they were

born to spawn, and then return to ocean waters to live, migrating along the coastline.  The

fish spawned from the Chesapeake Bay ecosystem contribute the greatest number of

striped bass to the Atlantic coastal fishery, and the commercial fishery for Atlantic

coastal striped bass is based primarily on migrations of fish born in the Chesapeake Bay

area. Striped bass do not die after spawning.  They may live up to 30 years and reach 50

pounds or more.  The population of the coastal Atlantic striped bass depends heavily

upon the capability of older, larger, female ("cow") striped bass to successfully

reproduce.   Striped bass management is focused on maintaining a target spawning stock.

10.    In spring, older, larger, sexually mature cow striped bass migrate from the

Atlantic Ocean off the coast of North Carolina and return to the tidal freshwater rivers of

the Chesapeake Bay to spawn.  One of the key important spawning rivers of the Bay is

the Potomac River.  Peak spawning in this area usually does not occur until April, and it

has been the collective experience of your affiant and other agents involved in this

investigation that gravid female striped bass arrive from the ocean and migrate up the

narrowing Potomac River to their spawning areas where they begin to arrive in late

March and depart in early May.  A study conducted of the striped bass in the bay area

indicates maximum egg densities during peak spawning time occurred in an approximate

30 mile stretch of the Potomac from around Maryland Point upriver to just north of

5

Occoquan Bay.  Also, according to a 2002 study, peak catch rates in the spawning stretch of the Potomac River occur between around April 5th through April 27th.  Therefore, this primary spawning area of the Potomac River creates a narrowed concentration of mixed age, sexually mature spawning striped bass.  This spawning period, occurs during closed/reduced size limit seasons and at a time when regional market prices are at or near their highest.

**IV.**   **Regulation of the Potomac River Striped Bass Industry**

11.     The Potomac River, located in Maryland and Virginia, has a striped bass fishery regulated by three jurisdictions: the Potomac River Fisheries Commission (PRFC), the Maryland Department of Natural Resources (MDNR), and the Virginia Marine Resources Commission (VMRC).  These three jurisdictions each have a regulatory management system in place to monitor the commercial striped bass harvest, whose poundage quotas are set annually by the Atlantic States Marine Fisheries Commission (ASMFC).  In 2006, for instance, the ASMFC set the allowed commercial striped bass harvest for these three jurisdictions, which includes the entire Chesapeake Bay and its tributaries, at 4.39 million pounds.

12.     Generally, the main stem of the Potomac River is regulated by the PRFC jurisdiction, which is located in Maryland waters.  The PRFC is composed of representatives from both Maryland and Virginia who enact fishery regulations.  Because this jurisdiction has no enforcement officers, it relies on personnel from the MDNR and VMRC for enforcement of its regulations.  In order to comply with the quotas set by the ASMFC, this jurisdiction has a limited striped bass commercial fishery and regulates the harvest during open seasons, institutes size limits, issues a set number of striped bass tags

to licensed fishermen, and requires written reporting of a fisherman's striped bass harvest.

13.     The VMRC is responsible for regulating tributaries of the Potomac River located in Virginia.  This jurisdiction, much like the PRFC, also has a limited striped bass commercial fishery and regulates the harvest during open season, institutes size limits, issues a set number of tags to licensed commercial fisherman (2003-2005), and requires written reporting of each licensed commercial fisherman's striped bass harvest.

14.     The MDNR is responsible for regulating tributaries of the Potomac River located on the Maryland side of the river.  Much like the other two jurisdictions, the MDNR regulates the striped bass fishery by open seasons and size limits.[1]

15.     In the spring during the striped bass reproductive spawning period, the three fishery jurisdictions that make up striped bass management on the Potomac River become more restrictive on striped bass harvest in order to conserve the migrating female breeding stock.  At all times relevant to this investigation, Maryland and the PRFC closed their areas completely after March 25 and did not reopen their jurisdictional waters for commercial fishing until at least June 1. The Virginia areas (the Virginia Potomac River tributaries) remain open for commercial fishing after March 25th.  However, during this time the VMRC protects the larger breeding stock by setting a "slot size limit" of 18"-28" for striped bass from March 26 through June 16.  What this means is that fishermen in Virginia-regulated waters are allowed only to keep and target fish that are between 18 and 28 inches. This protects juvenile and the larger, sexually-mature

---

[1]     The **Decaturs** are licensed to fish in PRFC and VMRC waters.  They are not licensed in, and have not been known to fish in, MDNR waters.

breeding fish. During this investigation, by virtue of this limit and the complete closure of the Maryland and PRFC-regulated waters, no striped bass measuring over 28" in length could be targeted or harvested anywhere in the Potomac River between March 26th and June 16th, during the annual striped bass spawning period.

16.     Gill nets are one method used to commercially harvest striped bass from the Potomac River. The net's mesh lines slip over the back of a fish's gill cover when it swims through the net's openings and the fish becomes entangled. Commercial fishermen can target the size of fish they wish to harvest by increasing or decreasing the size of the holes in the mesh gill nets. Larger holes in the mesh net allow smaller fish to pass through, but the net will entangle the larger fish too big for the holes. Each individual striped bass commercially caught must be tagged, and each fisherman is issued a certain number of the total available tags, thereby limiting his total allowable catch to the number of tags he is issued. During open fishing seasons in the PRFC and VMRC jurisdictions of the Potomac River, striped bass harvested in gill nets must have the tag affixed at the net site before the boat leaves this site in the PRFC, and at the place of capture in the VMRC. During this investigation, the PRFC and the VMRC used commercial striped bass tags that were inscribed with individual numbering, indicated the jurisdiction by use of color and were clearly marked "VMRC" or "PRFC." The following year each jurisdiction would use a new color. Unused VMRC and PRFC tags issued for a particular year are required by regulations to be returned to the appropriate Commission at the end of the fishing season.

17.     It has been your affiant's experience during this investigation that some gill net fishermen will employ various illegal methods to take striped bass during closed

season to capitalize on higher market prices.  One illegal method employed is to tag
striped bass using a bordering jurisdiction tag where there is an open commercial season
while the season in the jurisdiction in which the fish is actually harvested is closed.
Other illegal methods that are employed include use of illegal fishing gear such as
oversized mesh nets used to target oversized fish.

18.     It has been your affiant's experience in this investigation that some of the
illegal striped bass taken in the Potomac River are transported in interstate commerce to
the markets of Washington D.C. during the closed/restricted size fishing seasons.
Documented wholesale prices for striped bass during this investigation averaged around
$1.50 per pound in 2003 during a period of high supply in the market.  As the supply of
striped bass decreased in regional markets during the 2003 and 2005 closed/restricted
size seasons, the price was as high as $2.75 per pound for oversized striped bass and
$4.00 per pound for legal sized striped bass.

**V.     Investigation**

**A.     Background**

19.     On March 25, 2001, a Virginia Marine Police (VMP) officer
apprehended **Jerry Decatur** and **Jerry Decatur, Jr.** with improperly tagged and
untagged striped bass on the Virginia shore of the Potomac River in Widewater on the
last day of the PRFC commercial gill net season.  **Decatur** received a VMRC summons
for ten striped bass and **Decatur Jr.** received a PRFC citation for two striped bass.   The
majority of the fish had tags placed through the gills, but the ends of the tags had not
been interlocked as required by PRFC regulations.  A Virginia judge later dismissed the

case against **Decatur** after finding that **Decatur** had attempted to tag the fish. **Decatur Jr.** was fined $50 for his offense.

20.     In February 2002, the same VMP officer notified a USFWS agent that the **Decaturs** were catching striped bass in PRFC waters, landing the fish in Virginia, improperly tagging the fish, and then transporting them into Washington D.C., where they were sold to **OceanPro/Profish**.  Further, the VMP officer notified the agent that employees at **OceanPro/Profish** would remove any striped bass tags that were not properly interlocked and return these "used and modified" tags to the **Decaturs** so they could be re-used.  Re-using striped bass tags is illegal in all jurisdictions of the Potomac because it allows a fisherman to harvest more than his set season allocation.

21.     In March 2002, the same VMP officer notified a USFWS agent that they had discovered that **Decatur** owned nets in the PRFC jurisdiction of the Potomac River that had a mesh size of eight inches.  PRFC regulations provide that the maximum allowable gill net mesh size is seven inches year round.  The VMP officer further said that the **Decaturs** bragged about having (illegal) unmarked sunken nets which they used to catch striped bass out of commercial season.  The officer said that the **Decaturs** had their nets in the river until May during 2001, even though the legal season had closed on March 25, 2001.  The officer also said that **Jerry Decatur** had told him that they made $600,000 during the previous year.  During March 2002, law enforcement officers on three separate occasions observed people whom they believed to be the **Decaturs** fishing gill nets in the PRFC jurisdiction.

22.     As a result of these reports and observations, in March 2003, the USFWS; the VMP, Special Investigations Unit; and the Maryland Natural Resources Police began an undercover operation into the unlawful striped bass fishing activities of the **Decaturs**.

23.     On March 5, 2004, a VMP agent, while working in a covert capacity, telephonically contacted Ben Clough, manager of **OceanPro/Profish**, at telephone number 1-800-967-9726.[2]  The officer was posing as a commercial fisherman and was offering to sell striped bass.  The officer told Clough that he was from Maryland, but also was getting and selling Virginia fish and was transporting the fish to Pennsylvania.  Clough said he sold many striped bass from everywhere, and did business of 5,000 to 10,000 pounds of striped bass per week.  Clough requested that the officer call him on his cellular phone in the afternoon when the boats land and when the officer had an idea what he was doing.  Clough said that his business was large enough to know everybody in the industry.  Clough discussed the fluctuating striped bass market and how he had declined to purchase striped bass that day for $2.75 a pound.  Clough said that if he gives the officer an order for 1,000 pounds of fish, the officer could back up (his vehicle) to **OceanPro/Profish** and off load the fish, after which an employee would sign the officer's invoice and the officer would be paid.  Clough said that if the price was right, he could pay the officer quicker.  Clough said that **OceanPro/Profish** opens as early as 4:00 a.m. and employees work until 10:00 to 11:00 p.m.  Clough requested that the striped bass be tagged and that they come from a state where there was an open season.

---

[2]     Internet records obtained indicated that this telephone number was registered to **OceanPro Ltd.** of 1900 Fenwick St., N.E., Washington, D.C.

11

**B.**     **Early Meetings with the Decaturs**

24.     On March 30, 2004, a VMP officer, posing in an undercover capacity as a corrupt police officer, met with **Decatur** and **Decatur Jr.  Decatur** said that they could only catch the big fish, and that his boat had been seized three times in the past for illegal transport of striped bass.  The **Decaturs** also talked about their method of reusing tags for striped bass.  **Decatur** showed the officer previously-used striped bass tags that he had in his possession inside his teal green Ford F-150 pickup truck with Virginia license plate ZRY-4983.[3]  The **Decaturs** talked about their method of submerging the nets so they would remain undetected.  **Decatur** said that striped bass prices rise when the Potomac (PRFC) season closes, and that he had gotten $4.00 a pound in April.

25.     On the same day, other VMP officers observed three occupants in a grey center console boat believed to be owned by the **Decaturs** lay out an illegal unmarked gill net in PRFC waters of the Potomac.[4]  The season for gill nets in the Potomac had closed on March 26, 2004.  The officers said the net was set near Quantico Marine Corps Base.   This grey center console boat is believed to be owned by the **Decaturs** because they were observed commercially fishing in this boat on at least five subsequent occasions during this investigation.  In November 2004, your affiant also observed what

---

[3]     A Virginia DMV query revealed this truck was registered to **Decatur** at xxxx, Stafford, Virginia.

[4]     In addition to striped bass, catfish and shad are found in the Potomac river during the closed/restricted size season for striped bass.  The **Decaturs** are not known to fish for shad, and they were not seen with shad during this investigation.  Moreover, the mesh size of the gill nets that the **Decaturs** typically used during this investigation are too large to catch shad.  The gill nets typically used by the **Decaturs** also are not effective or commonly-used means of fishing for catfish.

was believed to be this same dark grey center console boat moored in the Potomac River just offshore of the **Decatur's** beach boat landing area and cabin.

26.     The following day, on March 31, 2004, a VMP officer saw what appeared to be the same boat with three occupants go to the same net location (in PRFC waters) and fish.

27.     On January 31, 2005, the undercover officer, who had left the VMP and now was working as a Deputy Sheriff for the Sheriff's Department in King George County, Virginia, and as a confidential informant for the USFWS, met with **Decatur**. **Decatur** said that they sell their fish forty miles north.[5]  **Decatur** also discussed the size limits of the striped bass sold to markets in Washington, D.C.  **Decatur** said that he had heard from someone that D.C. did not have a size limit on rockfish (striped bass). **Decatur** showed photographs of untagged rockfish to the officer**.**  These photographs appeared to have been taken at the river shore.  Tagging rockfish at the river shore instead of at the net site, or at the place of capture, is in violation of PRFC and VMRC regulations, respectively.   **Decatur** told the officer that they did not need new striped bass tags because they reuse them, but **Decatur** also said that they had indicated on their catch reports that they had used all of their tags in 2004.

     **C.     Illegal Receipt and Sale of Fish by Decaturs in 2005**

          **1.     January through February 2005**

28.     In January 2005, **Decatur Jr.** invited the Deputy Sheriff to go on a duck hunt, which hunt took place on January 11, 2005.  On that day, the Deputy Sheriff told

---

[5]     According to www.mapquest.com, **OceanPro/Profish** is located 42 miles north of **Decaturs'** residential address.

**Decatur Jr.**  about fishing in North Carolina and the size of striped bass found there.

**Decatur Jr.** told the Deputy Sheriff that he would like to have some of them.  Later that

day, the Deputy Sheriff told the **Decaturs** that he recently had caught striped bass in

North Carolina, and had kept some of the fish and given some away.  Although the

Deputy Sheriff told the **Decaturs** that sport-caught fish could not be sold, the **Decaturs**

told the Deputy Sheriff to bring any fish to them and they would take care of them.

29.    On February 10, 2005, the Deputy Sheriff delivered fourteen untagged

North Carolina hook-and-line-caught striped bass weighing 277.5 pounds to the

**Decaturs** without a bill of sale.  The Deputy Sheriff met **Decatur Jr.** at his residence at

xxxx, Stafford, VA.  **Decatur Jr.** told the Deputy Sheriff that he knew that it was illegal

to sell the fish.  Nonetheless, **Decatur Jr.** said that he would get rid of them.   The

Deputy Sheriff then saw **Decatur Jr.** place a phone call from a phone inside the

**Decaturs'** residence.  The Deputy Sheriff overheard **Decatur Jr.** negotiating a price with

"Clark" and overheard him settle on a price of $2.75 per pound.  The Deputy Sheriff said

that **Decatur** and **Decatur Jr.** discussed tagging the fish, and **Decatur** later handed an

unopened bag of Virginia (VMRC) tags to **Decatur Jr.** and told him to take them with

him.   The **Decaturs** removed the striped bass from the Deputy Sheriff's truck and placed

them into their fish totes.  **Decatur Jr.** declined to tell the Deputy Sheriff where he was

taking the fish, but he did say that where he was taking them was not that far away.

**Decatur Jr.** then said that he was going up the road and he then departed.

30.    On February 11, 2005, **Decatur Jr.** telephonically told the Deputy Sheriff

that he had sold the fish for $2.75 per pound and received around $765.00 for the fish.

**Decatur Jr.** said he deposited the check that was given to him by the buyer.  At this time

14

of year, all of the Potomac River jurisdictions had open seasons for striped bass.

However, had the **Decaturs** tagged the fish that the Deputy Sheriff brought to them, as

they suggested, the **Decaturs** would have violated VMRC regulations that require all

striped bass to be tagged at the location where they are harvested.  Also, by accepting

striped bass from the Deputy Sheriff for sale, the **Decaturs** violated VMRC regulations

that require striped bass in the possession of a person other than the original harvester,

for the purpose of resale, to be accompanied by a bill of sale that includes the name of the

seller, the permit or license number of the seller if such permit or license is required in

the jurisdiction of harvest, the date of sale, the pounds of striped bass in possession, the

location of catch and the gear type used to harvest the striped bass.

31.     On February 14, 2005, **Decatur Jr.** paid the Deputy Sheriff $755.00 cash

for the striped bass the Deputy Sheriff had delivered to them four days prior.  **Decatur**

**Jr.** offered the Deputy Sheriff the receipt from the market, but he declined, and **Decatur**

**Jr.** then threw away the receipt.

### 2.     March through May 2005

32.     Throughout this investigation, cellular telephone number xxxx was used

by **Jerry Decatur Jr.**  The Deputy Sheriff often contacted **Decatur Jr.** on this cell

number and vice versa.  Subpoenaed records established that xxxx is registered to **Jerry**

**Decatur Jr.** of xxxx, Stafford, Virginia.  Also, this same cell number is preprinted on the

face of **Decatur Jr.'s** waterfowl guiding business card.  The telephone number xxxx also

is pre-printed on that card.  Subpoenaed telephone records indicate that xxxx is registered

to **Jerry Decatur** of xxxx, Stafford, Virginia and that cellular telephone number xxxx is

15

registered to **Jerry Decatur Jr.** of xxxx, Stafford, Virginia..  Subpoenaed telephone

records also establish that the cellular telephone number xxxx is registered to Ben

Clough, the manager of **OceanPro/Profish**.

33.      For the period of the 2005 closed PRFC and restricted size VMRC striped

bass season, the **Decaturs'** cellular and long distance home telephone records were

subpoenaed.  Those records reflect that during this time, the **Decaturs** called three fish

dealers: one located in Arlington, Virginia, and two, including **OceanPro/Profish**,

located in Washington, D.C.  In early April 2005, **Decatur** placed his only known call to

the Arlington dealer.  A few weeks later, **Decatur** told the Deputy Sheriff that the

Arlington dealer only would take legal-sized fish.  In view of this statement and the fact

that VMP officers routinely inspect Virginia fish dealers, your affiant believes that the

**Decaturs** sold their oversized fish in Washington, D.C.  The other D.C. fish dealer

contacted by the **Decaturs** has its main store and office in Washington, D.C., and another

store in Great Falls, Virginia.  This dealer is a smaller volume wholesale and retail

business with annual sales of approximately $500,000 in the D.C. store and $220,000 in

the Great Falls store.  On April 5, 2005, the Deputy Sheriff overheard **Decatur Jr.** call a

fish dealer, and after the call ended **Decatur Jr.** stated that they wanted up to 100

pounds.  Subpoenaed records indicate that this call was placed to a telephone number

registered to the other D.C. fish dealer.  As the **Decaturs** generally had available for sale

well over 100 pounds of rockfish at a time during the closed PRFC and restricted size

VMRC season, your affiant believes that the **Decaturs** sold those fish primarily to

**OceanPro/Profish**.

34.     On March 31, 2005, at 3:02 p.m., a call was initiated by Clough's cell phone number to **Decatur Jr.'s** cell phone number.  The next day, on April 1, 2005, a VMP officer informed the Deputy Sheriff that he had found and seized an unmarked net with oversized mesh near "Cooks Bar" (PRFC jurisdiction).  Crab pot floats attached to that net bore numbers registered to **Jerry Decatur, Jerry Decatur Jr.**, and Jason Decatur.  Jason Decatur is the son of **Jerry Decatur** and brother of **Jerry Decatur Jr.**[6]

35.     Also on April 1, 2005, the Deputy Sheriff had a telephone conversation with **Decatur Jr.** in which **Decatur Jr.** told him that he would like to have a piece of ten inch net set on the channel bank.  Your affiant believes this reference is to the bank of the Potomac shipping channel, which is located in the PRFC jurisdiction.  **Decatur Jr.** commented that you had to be careful with gravid fish and not lay them on top of one another because it would result in the fish losing weight (loss of roe).  **Decatur Jr.** said that he had a photograph of an 85 pound fish they had caught two years prior around May 15th in a net.  He said that at the time (two years prior), they were getting $3.85 a pound. The Deputy Sheriff told **Decatur Jr.** that he had left a message with **Decatur** and that he would meet them the following day.

36.     On April 2, 2005, the Deputy Sheriff delivered fourteen untagged, Virginia (VMRC) hook-and-line-caught striped bass to **Jerry Decatur** and **Jerry Decatur Jr.** at Widewater in Stafford, Virginia, without a bill of sale.  Agents previously had weighed the striped bass at 181 pounds.  Nine of the fish measured between 29" to

---

[6]     A USFWS agent took custody of that net on November 17, 2005.  The agent measured the net at two different locations and discovered that its mesh was eight inches.  The legal net maximum mesh size in the PRFC is seven inches.

37" in length, over the VMRC maximum commercial size limit of 28". The Deputy

Sheriff reported that **Decatur** retrieved some 2004 VMRC striped bass tags from the cab

of his teal green Ford F-150 pickup truck and **Decatur** said he was going to tag the fish

before he transported them. **Decatur Jr.** said that the fish would be legal because they

were going to tag them, but he also said the fish were oversized. Contrary to **Decatur**

**Jr.'s** statement, the fish would not have been tagged legally for two reasons: (1) 2004

VMRC striped bass tags may not be used lawfully in 2005 since VMRC regulations

require all unused striped bass tags to be returned to the Commission at the end of the

season; and (2) VMRC striped bass tags are valid only for use by the permittee to whom

they were allotted, and that permittee is required to be onboard the boat when the striped

bass are harvested and the tags applied. **Decatur** said that he was being paid $1.75 per

pound. **Decatur** commented about a fish market located in Washington, D.C. where they

usually take all their fish, but he said they were full until the end of the season. **Decatur**

also said that they had the net (referenced in paragraph 35) in the river only one day

before the police found it and they had only caught seven or eight fish before it was

seized.

37. On or around April 3, 2005, the Deputy Sheriff had a telephone

conversation with **Decatur** in which **Decatur** asked the Deputy Sheriff if he had talked

with anyone concerning the seizure of the net. The Deputy Sheriff told him that he had

talked with the Marine Patrol officer, who said that the net had contained forty fish.

**Decatur** said that he should have never placed a cork on the net. **Decatur** said when

they were rigging his nets that there had been a couple of corks with their (crab pot)

numbers on it.  The Deputy Sheriff asked **Decatur** if he had taken his striped bass up the road for him and **Decatur** said he would the next afternoon.

38.    Based upon my knowledge, training and experience, I am aware that commercial fisherman often will retain several days catches of fresh fish, either refrigerated or on ice, before transporting and selling the catches to commercial buyers. This is particularly the case when those fish will not spend days in transit from the place of catch to the place of commercial sale.  Also, based upon my knowledge, training and experience, commercial fishermen will call commercial buyers to determine or negotiate the market price for fish a few days before or the day they intend to make a commercial sale.  Commercial buyers also will call commercial fisherman to place orders for fish, especially during periods of low supply.

39.    On April 4, 2005, at 9:03 a.m., subpoenaed telephone records indicate that a call was placed from other D.C. fish dealer to **Decatur Jr.'s** cell number.  Shortly thereafter, two calls were placed from **Decatur Jr.'s** cell number to telephone numbers for the other D.C. fish dealer.  The Deputy Sheriff met with **Decatur** and **Decatur Jr.** on April 5, 2005.  **Decatur** said that he had sold the Deputy Sheriff's striped bass (from April 2) for $311.00, and he then gave the Deputy Sheriff that amount of money in cash. As previously explained in paragraph 30, the **Decaturs** violated VMRC regulations by selling the fish that they had accepted from the Deputy Sheriff without proper documentation**.  Decatur** expressed his concerns for getting caught illegally fishing and asked the Deputy Sheriff to help them out and tell them where the VMP would be.

40.     At 11:31 a.m. on April 6, 2005, subpoenaed telephone records indicate that a call occurred from **Decatur Jr.'s** cell number to the other D.C. fish dealer.  At 11:53 a.m. on April 6, 2005, subpoenaed telephone records indicate that a call occurred from **OceanPro/Profish** manager Ben Clough's cell number to **Jerry Decatur, Jr.'s** home telephone number.

41.     On April 7, 2005, at 1:15 p.m., the Deputy Sheriff delivered nine untagged, Virginia (VMRC) hook-and-line-caught striped bass to **Decatur** and **Decatur Jr.** at their residence without a bill of sale.  Agents previously had weighed the nine striped bass at 155 pounds.  The fish measured between 31" to 37" in length, in excess of the 28" VMRC commercial striped bass maximum size limit.  The Deputy Sheriff said that **Decatur** and **Decatur Jr.** loaded the fish into a refrigerated unit mounted on a white, dual-wheeled pickup truck.  **Decatur** said he would take those fish to market the next afternoon along with any fish they may catch in the morning.  **Decatur** said he would tag all of those striped bass and that all he could be caught for was oversized fish.  As previously explained in paragraph 30, had the **Decaturs** tagged the fish they accepted from the Deputy Sheriff, as they suggested, the **Decaturs** would have violated VMRC regulations.

42.     On April 10, 2005, the Deputy Sheriff went to the **Decatur** fish camp and cabin located on the banks of the Potomac River in Stafford County, Virginia, where **Decatur** gave him $343.00 cash for the 155 pounds of striped bass that he had delivered to the **Decaturs** three days earlier.  As previously explained in paragraph 30, the **Decaturs** violated VMRC regulations by selling the fish that they had accepted from the

Deputy Sheriff without proper documentation**.  Decatur Jr.** said that on the previous day, the grey (center console) boat had broken down in the river as **Decatur** had been fishing a net.  The Deputy Sheriff observed **Decatur** and Trever Ottinger, the **Decaturs'** fishing helper, return from the middle of the Potomac River (PRFC jurisdiction) with striped bass contained in **Decatur's** grey center console boat.  **Decatur Jr.** said that they had caught 14 (striped bass) from a 10 inch net.  As **Decatur** drove away with the striped bass, the Deputy Sheriff noted that the back of the teal green Ford F-150 pickup truck was full of large striped bass that appeared to have been tagged with VMRC tags.  When **Decatur** returned several minutes later, the bed of the truck was empty.  **Decatur Jr.** said that **Decatur** had just fished the 10" inch net and was then going to fish another net.  The Deputy Sheriff watched as **Decatur** and Ottinger then returned to the river in the grey center console boat into the PRFC jurisdiction a second time.  When **Decatur** returned to the Virginia shore again, the Deputy Sheriff helped load the striped bass from the boat into the teal green Ford F-150 pickup truck and **Decatur** drove the truck away.  **Decatur** returned moments later in a different vehicle and said that he had delivered the fish to the house and they would be fine overnight.  The Deputy Sheriff saw **Decatur** and Ottinger in the PRFC both times as they transported the striped bass contained in the boat back to the Virginia shore.  All of these striped bass were caught in the PRFC during the PRFC closed season.

43.     On April 14, 2005, the Deputy Sheriff met with **Decatur, Decatur Jr.**, and Ottinger at the **Decatur** fish camp and cabin.  When he first arrived, the Deputy Sheriff saw two of **Decatur's** boats one to two miles out in the PRFC jurisdiction.

21

**Decatur Jr.** was in a Crabman II boat which was towing the grey center console boat

occupied by **Decatur** and Ottinger.[7]  The two boats crossed from the PRFC jurisdiction

in Maryland waters before they landed in Virginia.  The Deputy Sheriff saw striped bass

in the grey center console boat and also saw Ottinger placing tags on some of the striped

bass.  The Deputy Sheriff saw a total of 45 striped bass that were tagged using 2004

PRFC tags, 2005 PRFC tags, 2004 VMRC tags, and 2005 VMRC tags.  All of the PRFC

tagged striped bass, if caught in PRFC-regulated waters as their tags indicated, were

caught during closed commercial striped bass season.  If they were caught in other

waters, those fish tagged with PRFC tags were labeled falsely.  All of the fish tagged

with expired VMRC tags were tagged in violation of VMRC regulations.

44.     **Decatur** told the Deputy Sheriff that day that they had 650 to700 pounds

of fish.  **Decatur** said some of the fish came from the eight inch net and nine of the fish

came from the ten inch net.  Despite the Deputy Sheriff's observations to the contrary,

**Decatur** claimed that all these fish came out of Virginia that day.  **Decatur** also said one

of the fish probably weighed fifty pounds.  Your affiant believes that a fifty pound fish

would measure well over the maximum VMRC size limit of 28".  The fish were

offloaded from the boat and into the bed of **Decatur's** teal green Ford F-150 pickup

truck. **Decatur** commented that he was going to the house and drove away in the truck.

**Decatur** returned to the cabin area shortly thereafter driving a different truck.

---

[7]     Records received from a law enforcement database query and information
provided by the Deputy Sheriff indicate that the Crabman II boat is registered to **Jerry
Decatur** of xxxx, Stafford, Virginia.  This information also indicates that the Crabman II
is a 25'4" Parker boat with Virginia registration number 8511AJ and a hull identification
number of PXMKK212H495.

45.     On April 15, 2005, **Decatur Jr.** told the Deputy Sheriff in a telephone conversation that he thought the fish from the previous day had been sold.

46.     On April 18, 2005, the Deputy Sheriff had a telephone conversation with **Decatur** in which **Decatur** asked him where the Marine Patrol officers were going to be that day.

47.     On April 18, 2005, at 2:20 p.m., a call took place between the home telephone number registered to **Jerry Decatur Jr.** and the cell number registered to **OceanPro/Profish** manager Ben Clough.

48.     On April 20, 2005, at 5:46 p.m., **Decatur Jr.** told the Deputy Sheriff in a telephone conversation that he was keeping his eyes open because they were at the time, "fishing a trot line" in the river.  The Deputy Sheriff understood "trot line" to be a code word for a gill net.[8]

49.     On April 22, 2005, at 4:40 p.m., the Deputy Sheriff arrived at the **Decaturs** landing and met with **Decatur** and Ottinger.  **Decatur** told the Deputy Sheriff that they had (recently) caught ten, twelve, fourteen, and nine fish but they had caught none the previous day.  **Decatur** asked the Deputy Sheriff what the Marine Patrol officers work schedules were for the rest of the week, and **Decatur** said he would fish in the mornings since the officers were working in the afternoons.  The Deputy Sheriff then boarded the grey center console  boat with **Decatur** and Ottinger and they traveled north near Sandy Point in the main stem of the Potomac River in Maryland waters (PRFC).

---

[8]     Subpoenaed cell phone records indicate that on April 21, 2005, at 9:51 a.m., a call was placed from **Decatur Jr.'s** cell number to a telephone number for the other D.C. fish dealer.

The Deputy Sheriff saw Ottinger use a grappling hook overboard and find a gill net,

which they proceeded to "fish."  They removed sixteen striped bass in the net, which

**Decatur** said had 8" mesh.  **Decatur** then drove the boat northward to another net, which

he said had 10" mesh.  At one point as they fished, **Decatur** held up a striped bass which

had a visible tracking tag attached to the fish.  **Decatur** told the Deputy Sheriff to take

the tag and find out where the fish came from.  **Decatur** said to tell them the fish came

from the "Rappahannock River" (VMRC jurisdiction).  The tag, which was retained by

the Deputy Sheriff, had been placed on a wild striped bass on July 1, 1999, in

Massachusetts.  At the time the fish was tagged almost six years prior, it had measured

34.87" in length.  As **Decatur** drove the boat back to their Widewater landing, Ottinger

and the Deputy Sheriff attached VMRC tags on the striped bass.[9]  **Decatur** indicated that

he used Virginia (VMRC) tags because his markets might think the fish are from a frozen

(legitimate) supply. The Deputy Sheriff saw that seventeen striped bass were loaded from

the boat into **Decatur's** teal green Ford F-150 pickup truck.  All seventeen of the striped

bass were taken that day in the PRFC and therefore were caught during closed

commercial striped bass season. Also, the fish were caught in PRFC waters and then

were labeled falsely with VMRC tags.  **Decatur** said that he was getting $2.75 per pound

for striped bass.  **Decatur** commented about a seafood dealer located in Arlington,

Virginia, and said that they would buy the striped bass under 28" (legal size) for $4.00

per pound.  But, **Decatur** continued, he could not take these fish there because they were

oversized.   **Decatur** then gave the Deputy Sheriff $300.00 cash.

---

[9]      A USFWS agent and a MDNR police officer observed these fishing activities
from the banks of Sandy Point State Park in Maryland.

50.     On April 23, 2005, **Decatur** told the Deputy Sheriff in a telephone conversation that they sold the fish that they had caught the previous day for $2.75 (per pound) and that he could not get any more for them.

51.     Subpoenaed phone records revealed that at 9:25 a.m. on April 24, 2005, a call occurred from the cell number registered to **Decatur Jr.** to the cell number registered to Ben Clough (**OceanPro/Profish** Manager).

52.     Your affiant received information from a confidential informant who has known the **Decaturs** for several years that on April 28th, 30th, and May 2, 2005, it observed **Decatur** transfer striped bass from his boat to the teal green Ford F-150 pickup truck at a location near the **Decatur's** landing in Stafford County, Virginia.  The informant observed this activity between 9:00 a.m. and 12:00 p.m. on April 28th and April 30th.  On May 2nd, this activity occurred around 6:00 p.m.  The informant said that on these three occasions, it observed **Jerry Decatur** back the teal green pickup to the Potomac River where it rendezvoused with a fishing boat.  The informant said **Jerry Decatur** and the boat operator would throw striped bass into the bed of the truck from the boat.  The informant said this would last only five minutes and they worked very fast.

53.     Subpoenaed phone records revealed that at 9:47 a.m. on April 28, 2005, during the time period the informant observed **Decatur** conducting striped bass fishing activity, a call was initiated from the cell number registered to **Decatur Jr.** to the cell number registered to Ben Clough (**OceanPro/Profish** Manager).  At 10:14 a.m., subpoenaed records indicate a second phone call was made from a cell number registered to **Decatur Jr.** to a telephone number that is registered to **OceanPro/Profish** and also is

advertised on the side of **Profish-**marked refrigerated trucks parked in front of the

business at 1900 Fenwick St., N.E., Washington, D.C.

54.     On May 1, 2005, **Decatur** told the Deputy Sheriff that he hauls fish before

the traffic gets bad and that when he comes back in the mornings, the traffic is backed up

from Dumfries all the way to D.C.  During that same meeting, **Decatur** said that he

hoped to take fish up the road early the next morning.

55.     On May 5, 2005, your affiant and another USFWS agent followed

**Decatur's** teal green Ford F-150 pickup truck from the Boswell's Corner area in Virginia

to Washington, D.C.   The truck backed into the loading dock area of **OceanPro/Profish**

at 1900 Fenwick Street, N.E. at about 3:42 a.m.  The agents temporarily lost direct visual

contact with the vehicle until approximately 3:43 a.m.  When visual contact was restored,

the truck was parked on the opposite side of Fenwick Street from **OceanPro/Profish**.

An agent saw a male walk from the pickup truck to **OceanPro/Profish** and a few

minutes later, he saw that subject return back to the truck.  At 3:53 a.m., the truck

departed Fenwick Street and headed back toward Virginia.

56.     Later that same day, at 4:40 p.m. on May 5, 2005, the confidential

informant videotaped **Decatur,** who was assisted by Ottinger, transferring striped bass

from his vessel, the Crabman II, into the teal green Ford F-150 pickup truck.  The

transfer of the fish was near the **Decatur** cabin and landing and occurred on the Virginia

shoreline of the Potomac River in Stafford County, Virginia.  A review of the video tape

and enlarged photographs from that video by your affiant and another USFWS agent

indicates that at least eighteen striped bass clearly were visible being transferred from the

boat to the pickup truck.  These striped bass appeared to have no tags visibly affixed, and those striped bass which can be observed clearly in the video and enlarged photographs appear to be over 28" in length.

57.     Still later that same day, in a phone conversation at 8:03 p.m. on May 5, 2005, **Decatur** told the Deputy Sheriff that he had caught 26 striped bass that day. **Decatur** also told the Deputy Sheriff that they had caught seventeen, fifteen, and twenty-six.

58.     Three days later, on May 8, 2005, subpoenaed phone records reflect two calls from the cell number registered to **Decatur Jr.** to the cell number registered to Ben Clough (Manager of **OceanPro/Profish**).  The first call occurred at 1:27 p.m. and the second call was at 2:52 p.m.

59.     Later on that same day, May 8, 2005, the Deputy Sheriff saw **Decatur, Decatur Jr.**, and Ottinger depart their landing aboard **Decatur's** Crabman II boat and head out into the PRFC jurisdiction.  The Deputy Sheriff saw them fish a net in the river and return in thirty minutes with eighteen striped bass in the boat, which they moved to the teal green Ford F-150 pickup truck.  The Deputy Sheriff observed that the striped bass were untagged and that they were fish measuring thirty inches and over in length. All of the striped bass were taken that day in the PRFC and therefore were caught during closed commercial striped bass season. The striped bass also were transported from Maryland and landed in Virginia.  The Deputy Sheriff then saw **Decatur** drive away. When he returned a few minutes later, **Decatur** placed $300.00 cash into the rear pants pocket of the Deputy Sheriff and **Decatur** thanked the Deputy Sheriff for his help.

27

### D.      Recent Illegal Activities

60.      On April 17, 2007, the Deputy Sheriff had a telephone conversation with **Decatur** in which **Decatur** said that (the new VMRC system) was good for fishermen because they could underestimate their catches (to VMRC) so they could get additional tags. **Decatur** said that he would write down fewer pounds on his catch reports so that he could get more tags. He said his catch report reflects that he sells (striped bass) to the public so that his reports do not need to match up to the buyers (VMRC reports). **Decatur** said that he does this so that the VMRC and PRFC cannot keep track of his catches.[10]

## VI.    Items to be Seized

61.      The commercial fish industry is a highly regulated industry which requires careful documentation of fish purchases. Based on the experience of your affiant and other agents involved in this investigation, businesses engaging in the commercial fish industry typically maintain books and other records at their business locations. These books and records commonly include journals, ledgers, and other records showing the receipt and expenditure of funds. The flow of funds into and out of a business can be tracked by tracing the "paper trail" of transactions. The "paper trail" is created by the entries into the business records, the documents received or prepared to support a transaction, and bank accounts. It also has been the experience of the agents

---

[10]      Prior to 2006, VMRC licensed fishermen were issued a set number of tags before the fishing season and could not receive additional tags during the fishing season. Beginning in 2006, a licensed fisherman could receive additional tags from the VMRC during the fishing season if his catch reports reflected that his seasonal poundage quota had not been met.

and officers involved in this investigation that when recording the species of fish

involved in illegal commercial transactions, the harvester or dealer may use in the written

documentation or receipts, notations, common names, false names, abbreviations, or

omissions to attempt to disguise the true identity or quantity of the species of fish being

bought or sold.

62.     Your affiant has found that business records ordinarily are kept and

maintained at the place of business for extended periods up to several years in order to

provide support for revenue and expense transactions if questioned by internal revenue

examiners or law enforcement, among other reasons. Your affiant therefore expects that

**OceanPro/Profish** still will have records on site documenting purchases of striped bass

from **Jerry Decatur Jr., Jerry Decatur**, or Trever Ottinger during 2005.

63.     Based on the experience of your affiant and other agents involved in this

investigation, businesses involved in the commercial fish industry are known to use

computers in the operation of their business.  On August 28, 2006, a USFWS agent

entered the **OceanPro/Profish** business at 1900 Fenwick Street, N.E., Washington, D.C.,

and observed a large open warehouse area connected to loading docks and an office

immediately to the left upon entering.  Inside the office, the agent observed a computer

on top of a desk and cabinets.

64.     Again based upon my knowledge, training, and experience, and that of

other agents involved in this investigation, I know that searching and seizing information

from computers often requires agents to seize most or all computers and computer

storage devices (along with related peripherals) so that they may be searched later by a

qualified computer expert in a laboratory or other controlled environment. This procedure is necessary for the following reasons:

A. **The volume of evidence.** Computer storage devices (such as hard disks, CDs, diskettes, tapes) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence, for example, by storing information in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take weeks or months, depending on the volume of data stored, and it would thus be impractical to attempt this kind of data search on site.

B. **Technical requirements.** Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting procedure which is designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code imbedded system as a booby trap), the controlled environment of a laboratory is essential to its complete and accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security

devices so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

65.     In an attempt to ensure minimum disruption to the business, computer forensic experts will be assisting in the search and will attempt to create an electronic image of those parts of the computer that are likely to store files relative to evidence of a crime.  If imaging proves impractical or not possible for technical reasons, then the agents will seize those components of **OceanPro/Profish's** computer system that the computer expert believes must be seized to permit the agents to locate the computer files relative to evidence of a crime at an off-site location.  If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

66.     In light of these concerns, your affiant therefore requests the Court's permission to seize any computers and computer storage devices that are believed to contain evidence of crimes as described above, and to conduct an off-site search of such items for the evidence described, if upon arriving at the scene, the agents executing the search conclude that it would be impractical to search such items on-site for evidence.

31

## V.     Conclusions

67.     Based upon the foregoing, your affiant has probable cause to believe that between February and May 2005, **Jerry Decatur** and **Jerry Decatur, Jr.** unlawfully received, acquired, transported and falsely identified striped bass, or rockfish, in interstate commerce in violation of the Lacey Act, Title 16, United States Code, Sections 3372(a)(2)(A) and (d)(2), and that evidence of these offenses in the form of business records, as more fully described in Attachment B, currently is located at **OceanPro/Profish**, 1900 Fenwick Street, N.E., Washington D.C.

68.     It therefore is respectfully requested that a search warrant be issued authorizing the search of the business premises of **OceanPro/Profish**, 1900 Fenwick Street, N.E., Washington D.C., and the seizure of items of evidence concealed within.

_____
Allen Hundley
Special Agent
U.S. Fish and Wildlife Service

Sworn to before me and subscribed to in my presence
this _____ day of August, 2007

_____
United States Magistrate Judge

**ATTACHMENT A**

**<u>DESCRIPTION OF PROPERTY TO BE SEARCHED</u>**

OceanPro Industries, Ltd. is located at 1900 Fenwick Street, N.E., Washington, D.C..  The property to be searched includes the business building of OceanPro Industries, Ltd.  It is described as a 1400 square foot, one story, red brick building.  It is marked by a sign reading OceanPro Industries, Ltd. and red numbering over an entry door indicating the street address of "1900".  It appears to have several loading dock bay doors and at least two doors at the front of the business facing Fenwick Street, N.E.

## ATTACHMENT B

## DESCRIPTION OF PROPERTY TO BE SEIZED

A.      Records and documents, including but not limited to correspondence, invoices, emails, price lists, permits, shipping documents, inventories, receipts, product labels and bank records, related to sales, purchases, payments receipt, or transportation, or attempts to do the same, of striped bass, rockfish, and fish to Jerry Decatur, Jerry Decatur, Jr. or Trever Ottinger.

B.      Checkbooks, check stubs, receipts, invoices, purchase orders, sales documents, canceled checks, wire transfer records, lines of credit, cash receipts, account ledgers, and all records pertaining to the transfer of any money or property interests or financial interest made for the purchase, sale, transportation, or handling of striped bass, rockfish, and fish to or by Jerry Decatur, Jerry Decatur, Jr. or Trever Ottinger.

C.      All records related to the processing, distribution, transportation, purchase, sale, offer for sale of striped bass, rockfish, or fish, which includes size/weight categories, offer sheets, corresponding dollar values for each size/weight category to or by Jerry Decatur, Jerry Decatur, Jr. or Trever Ottinger.

D.      Any other records and documents that refer to Jerry Decatur, Jerry Decatur Jr., or Trever Ottinger.

E.      Records and documents that reflect knowledge of relevant State laws and regulations related to the harvest, possession, sale, and purchase of striped bass or rockfish.

F.      Untagged wild striped bass, illegally possessed striped bass, oversized striped bass, undersized striped bass or illegally tagged striped bass.

G.      Any expired, altered, modified, or counterfeit striped bass identification tags.

I.      Any computer equipment and storage device capable of being used to commit, further or store evidence of the offenses listed above.